OPINION. Murdock, Judge; The petitioners contend that the change in the stock ownership of Theatres, which resulted in the termination of its profit-sharing plan in which Ilarry was a participant, was tantamount to Harry’s separation from the service of his employer, and the distribution to him in 1950 of his share of the trust should be taxed to him as long-term capital gain under the provisions of section 165 (b) of the Internal Revenue Code of 1939.[1] They have cited no authority in support of this proposition. The tentative approval under section 165 (a) granted to the trust by the Commissioner of Internal Revenue on June 10, 1946, was withdrawn as of December 31,1948. The provisions of section 165 (b) do not apply to distributions from a trust which is not exempt under section 165 (a) for the taxable year of the trust in which the distribution is made and the taxability of such distribution depends upon other provisions of the Internal Revenue Code. Regs. Ill, sec. 29.165-6. Furthermore, it is clear from the stipulated facts that Harry was not separated from the service of his employer within the meaning of section 165 (b). The trust was terminated on January 3, 1950, the same day that Harry was reelected treasurer of Theatres and while the stock was still held by the old stockholders. There is nothing in the record to show when, if ever, Harry ceased to render services to and severed his connection with the original corporate employer. The petitioners’ contention on this issue is clearly erroneous and the Commissioner's determination is sustained. Estate of Frank B. Fry, 19 T. C. 461, affirmed per curiam 205 F. 2d 517; Edward Joseph Glinske, Jr., 17 T. C. 562; cf. Mary Miller, 22 T. C. 293. The petitioners’ other contention is that they are entitled to a deduction of $20,776.40 as a nonbusiness bad debt under section 23 (k) (4). The amount is alleged to represent the difference between the total advances of Harry to Circle-A Ranch, Inc., and the amount which he received in the complete liquidation of that corporation. The Commissioner argues that the corporation was a fiction for tax purposes, no valid debt existed, and the advances were intended to be gifts to his sister-in-law prompted in part by the fact that they would offset'large capital gains which the petitioners had to report for 1950. The Commissioner’s determination that the petitioners are not entitled to the deduction claimed as a nonbusiness bad debt is presumed to be correct until shown to be otherwise by a fair preponderance of the evidence. The corporation was organized in August 1947 by the petitioners. No more than $1,000 was paid in as capital. The corporation never engaged in business and had no income, although it had expenses of $2,268.46. It never acquired any property until August 1949 when it bought 66 acres of farm land and improvements from Harry for $8,700. ITe put up the money for the purchase. The land was adjacent to other land which Anna and her sister had acquired through inheritance. Thereafter the land and buildings thereon were improved at a cost of $30,755.75 derived from advances made by Harry and from a bank loan of $17,500 guaranteed by him. The corporation gave Harry no note, there was no provision for interest, no date was fixed for payment and no security was furnished for his advances. Cf. Joseph B. Thomas, 2 T. C. 193. The land was transferred to Anna’s sister on December 6, 1950, which was shortly after the improvements had been completed. The stated purchase price was $20,000, to consist of $2,500 cash and a mortgage for $17,500. Actually the purchaser paid no cash. Harry gave to the bank his personal note with the mortgage as collateral in place of the corporation’s note which he had guaranteed. It is difficult to understand from the essential facts recited above just what Harry was trying to do in carrying out these various transactions. He gave no satisfactory explanation in his testimony of why he turned over to his sister-in-law for nothing except her obligation on the $17,500 mortgage, the property in which he had just invested $39,455.75. The record shows that Hattie was employed by Harry, she had relatively small income, she and Anna owned other adjacent land, some of which had been in their family previously, and Harry had substantial income and large capital gains in 1950. A logical conclusion would be that Harry was taking care of his sister-in-law, but whatever his purpose may have been, the evidence leaves strong inferences inconsistent with the existence of a worthless debt for tax purposes and fails to overcome the presumption of correctness attached to the Commissioner’s determination that no loss was sustained from a nonbusiness bad debt. Decisions will be entered for the deficiencies as determined by the Commissioner. SEC. 165. EMPLOYEES’ TRUSTS. (b) Taxability of REXBFiciARY.-r-The amount actually distributed or made available to any distributee by any such trust shall be taxable to him, In the year in which so distributed or made available, under section 22 (b) (2) as if It were an annuity the consideration for which is the amount contributed by the employee, except that If the total distributions payable with respect to any employee are paid to the distributee within one taxable year of the distributee on account of the employee's separation from the service, the amount of such distribution to the extent exceeding the amounts contributed by the employee, shall be considered a gain from the sale or exchange of a capital asset held for more than 6 months. * * •